<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

CHRISTINA BARNES          :
                               :
              Plaintiff,      :     Hon. Joseph H. Rodriguez
                               :
        v.                  :     Civil Action No. 08-1703
                               :
OFFICE DEPOT, INC.,      :
                               :
                               :         **OPINION**
            Defendant.     :

_____

**RODRIGUEZ**, Senior District Judge:

This is an employment discrimination suit filed by Christina Barnes, against her former employer, Office Depot, Inc.[1]  Ms. Barnes asserts that she was discriminated against based on her pregnancy and terminated in retaliation for her complaints of pregnancy discrimination in violation of Title VII, 42 U.S.C. § 2000e-2(a), and the New Jersey Law Against Discrimination, N.J STAT. ANN. § 10:5-12(a).  Office Depot moves for summary judgment pursuant to Fed. R. Civ. P. 56.  Oral argument was heard on the motion on November 4, 2009.  For the reasons expressed on the record that day, as well as those set forth below, Defendant's Motion for Summary Judgment [17] will be <u>granted in part</u> and <u>denied in part</u>.

## I. BACKGROUND

Office Depot, Inc. is in the business of manufacturing and selling office supplies.

_____

[1] This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346.

Plaintiff, Christina Barnes was hired by Office Depot in December 2006 and was employed in the Westampton, New Jersey Warehouse facility.  As a warehouse employee, Ms. Barnes reviewed order forms and filled boxes with the necessary merchandise located in her assigned zone.  Ms. Barnes was supervised by Karen Butfuloski, Donald Jackson, and Mike Alfano.[2]  In January 2007, while working for Office Depot, Ms. Barnes became pregnant.  Ms. Barnes advised her supervisors of her pregnancy on February 19, 2007. (Barnes at 200:12- 200:17.)[3]  Between February and July of 2007, Barnes was disciplined multiple times by supervisors for repeated absences from her work area and for poor work performance and then was ultimately discharged on July 17, 2007.

Employees are required to remain their zones in order to ensure that boxes continue to travel along the conveyor belt to the next zone so that production is not delayed.[4]  Office Depot schedules two breaks each day for warehouse employees, one of which is a half-hour meal break.  (Barnes at 183:12- 183:21.)  However, due to her

---

[2] Stanley Michieka, a Senior Operations Manager for Office Depot oversees running of the warehouse.  Michieka did not supervise Ms. Barnes directly, but managed supervisors responsible for Plaintiff's termination.

[3] Citations to deposition transcripts are made in the following format: ([Deponent's name] at [page number]:[line number]-[page number]:[line number]).

[4] The warehouse is organized into different zones, which contain the company's merchandise that must be gathered and placed in boxes to be shipped to customers.  In her deposition, Ms. Barnes described the Office Depot's production line: order forms are created in the batch room; next, boxes are constructed according to the size of an order and each order form is placed inside the box; then that box is transported to each different zone on a conveyor belt in order to be filled with the correct items.  Each zone has an employee assigned to it who is responsible for filling the boxes that pass with the items on the order form that are located in that zone.

pregnancy Plaintiff required more frequent breaks to drink water and use the restroom.[5] Office Depot permitted Plaintiff to go to the bathroom as many times as she needed, on the condition that she inform a supervisor when she left her zone.  The conflict appears to have arisen because Ms. Barnes allegedly did not return back to her work station immediately after her breaks, and that impacted the flow of production.   (Butfuloski at 30:12-31:15.)  Mr. Alfano testified that he had to remind her to return directly back to her work zone after using the restroom multiple times and personally observed Ms. Barnes wandering around the building two to three times per week.  (Alfano at 45:16-46:6.)  Plaintiff concedes that she would "continuously" go to the water cooler to refill her water cup and went to the bathroom "ten times a day," but believes that her absences did not justify discipline.  (Barnes at 157:5-158:4.)  In her deposition, Ms. Barnes stated that in most instances she was able to locate a supervisor and would notify them that she needed to go to the bathroom. If no manger could be found, she testified that she told one of her nearby co-workers and would not leave for more than fifteen minutes.  (Barnes at 124:12-124:25.)

Prior to Plaintiff's pregnancy announcement, she did not receive any written discipline from Office Depot for poor performance or misconduct.  Defendant argues that in fact Ms. Barnes was told that she was not performing her job satisfactorily prior to announcing her pregnancy; however, a written record was only initiated after

---

[5] Ms. Barnes asserts that she experienced nausea and vomiting due to her pregnancy; however, she submitted no medical documentation supporting the contention that she required extended breaks. Plaintiff consulted her OBGyn on May 11, 2007, and was told that she was in good health and able to work. That doctor, Dr. Laura Dalton, told Ms. Barnes that there was no need for her to be on any kind of disability and wrote a note stating, "This patient is under care for her pregnancy.  She may meet the requirements of her job including lifting up to 75 pounds if needed."  (Def. Ex. N.)

supervisors learned of her pregnancy.   Just a few days after she informed management that she was pregnant, Ms. Barnes was written up for the first time.  (Def. Ex. X)

"Office Depot provides a performance improvement policy based on a system of progressive steps with associates to correct performance or conduct issues. . ." (Def. Ex. X, "Performance Improvement Process.")  The company places underperforming employees on a Performance Improvement Process ("PIP") and issues written warnings when performance issues arise.  While an employee for Office Depot, Ms. Barnes received three written PIPS and was terminated after receipt of her fourth PIP.  On February 27, 2007, Barnes was placed on PIP by Donald Jackson because she left her assigned spot in Zone 5 without permission and "continued to wander around the building".  (Def. Ex. F.)  Plaintiff received a PIP on April 9, 2007 for committing fourteen errors during the week of April 1, 2007 - four more than the permissible ten errors. (Def. Ex. I.)  On June 28, 2007, Plaintiff was given a PIP, constituting her final warning, for continued absence from her work zone.  Jackson issued the PIP and noted that on May 31, 2007, Plaintiff was absent from her work zone for a half hour, and on June 5, 2007, Plaintiff was missing from her work zone for fifteen minutes.  Then on July 17, 2007, Supervisor Alfano issued a final PIP to Plaintiff resulting in termination. That PIP was issued for leaving her work area without notifying her manager in order to return a cellular telephone to another employee in a different zone.[6]  (Def. Ex. R.) Plaintiff was terminated on that day.

In addition to the delays caused by Plaintiff's absence, Defendant claims that

_____

[6]  Office Depot maintains a cell phone policy: All cell phones are to be kept in lockers or in employee's cars and may not be in their possession. There is no cell phone use allowed on the floor. (Alfano Dep. at 83:7-83:10.)

Plaintiff was not meeting productivity expectations with respect to speed and accuracy, which is reflected in the second PIP issued after Plaintiff committed too many errors within one week. (Butfuloski at 30:12- 31:15.) Both supervisors and co-workers told Ms. Barnes that she was not working quickly enough and a manager told her that she needed to move faster, pick things right, and if she did not know where things were or what something includes, she should ask. (Barnes at 95:21-96:25.) Ms. Barnes was once reprimanded for turning off the conveyor belt in her zone and sitting down on a step ladder when everyone was backed up instead of going to another zone and helping co-workers. (Barnes at 99:22-100:25.)

The court recognizes that performance problems may be attributable in part to the uncomfortable conditions in the warehouse combined with the effect of Plaintiff's pregnancy on her physical state. The warehouse was described as very loud and very congested as well was very cold in the winter and very hot in the summer. (Alfano at 85:7-85:21.) Working in the warehouse is a physically demanding job, and warehouse pickers are required to lift boxes of office supplies. Initially Plaintiff's family doctor advised her not to do any heavy lifting in excess of five pounds or do any climbing due to her pregnancy. (Def. Ex. J.) When Plaintiff presented that note to Office Depot, she was assigned to a different job where the work did not require the same amount of lifting. (Alfano at 29:4-30:18.) Plaintiff, however argues that she was denied a move upstairs to an area where it was cooler and the work required no lifting at all. (Barnes at 233:3-233:13.)

While supervisors accommodated Ms. Barnes's physical limitations and need for frequent bathroom access, Plaintiff testified that she was told that she could not

constantly leave her area and that she "[could] hold going to the bathroom." (Barnes at 177:5-177:8.) Plaintiff also testified that Karen Butfuloski told her that, "everyone's not going to continue to do your job for you, and "[w]e are not just going to make up a position for you so that you continue working." (Id. at 180:11-180:14.) Supervisors told her that there were employees at the company who had worked through their entire pregnancy without any problems or restrictions. (Id. at 180:17-180:21.) Ms. Barnes also asserts that supervisors made discriminatory statements about her need to use the bathroom so frequently and that she walked too slowly to and from the bathroom.

Plaintiff contends that comments made by supervisors and the timing of the disciplinary measures taken by management reveal pregnancy discrimination existed. Plaintiff complained to Human Resources about these comments and the discrimination she perceived was occurring, but was told to direct her complaints towards her manager. (Barnes at 205:18- 205:24.) Barnes accordingly discussed her complaints with Stanley Michieka and Michelle Bullock. In Plaintiff's Affidavit filed with the motion opposing summary judgment she alleges that she also told Mr. Alfano and Mr. Jackson that she believed she was being disciplined because of her pregnancy. (Pl.'s Aff. at ¶¶ 7, 9.)

Office Depot provides employees with a handbook and training materials outlining procedures for lodging complaints of discrimination or unfair treatment. In the company's Code of Ethical Behavior, Office Depot explains that if an employee needs assistance or observes a violation of Office Depot's policies, the employee should first speak with her manager if possible. (Def. Ex. V at 3.) However, if an employee is uncomfortable talking with a manager there is a confidential associate hotline, which employees can call to report any illegal or unethical activity. (Def. Ex. W, "New Hire

6

Orientation" at 42.)  Ms. Barnes was disciplined for going to Human Resources (HR)

during her shift to complain about treatment by supervisors.  She was told to get

permission from a supervisor before going to HR or to use the hotline to ask questions.

(Def. Ex. K, "Manager's Record of Discussion.)

On July 17, 2007 after receiving her fourth PIP, Ms. Barnes was called into the

management offices and met with Michael Alfano, Karen Butfuloski and Donald

Jackson.  Ms. Barnes testified that in that meeting she was told that she had continued

to leave her area and would therefore be terminated.  (Barnes Dep. at 131: 10-:133:11.)

Before terminating Plaintiff, Mr. Alfano met with a representative from HR, Gail Parker,

who confirmed the termination decision.  (Alfano at 50:22-54:15).  Mr. Alfano testified

that he always sought the advice and approval of HR before terminating an employee.

Mr. Alfano told HR that he knew Ms. Barnes felt she was being disciplined because of

her pregnancy; however, he stated that her pregnancy was not the reason for her

termination.

On September 10, 2007, Plaintiff filed a charge of discrimination against Office

Depot with the Equal Employment Opportunity Commission (EEOC) alleging that she

was discriminated against and terminated in retaliation for complaints of pregnancy

discrimination.  On March 28, 2008, the EEOC issued a Notice of Dismissal and Notice

of Rights to Plaintiff, stating that the EEOC was "unable to conclude that the

information obtained establishes violations of the statutes" and informing Plaintiff that

she has the right to file a civil lawsuit in state or federal court within ninety days.  (Def.

Ex. U.)

Office Depot denies that its decision to terminate Ms. Barnes had anything to do

7

with her pregnancy and that in fact the company made numerous accommodations on her behalf.  Office Depot contends that Plaintiff failed to perform her job adequately and she was frequently absent from her work station for long periods of time, failed to do work efficiently, and was found socializing with co-workers on more than one occasion. This is the nondiscriminatory reason given for her termination.

## II. Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law."  Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 ©.  Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 ©.

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once

the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Andersen, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Credibility determinations are the province of the factfinder.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

In an employment discrimination case, the burden of persuasion on summary judgment remains unalterably with the employer as movant.  The employer must persuade the court that even if all of the inferences which could reasonably be drawn from the evidentiary materials of record were viewed in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiff's favor.  Doe v. C.A.R.S., 527 F.3d

9

358, 362 (3d Cir. 2008).

### III. Discussion

Counts I and III of the Complaint allege that Plaintiff was subjected to discriminatory comments regarding her pregnancy and was terminated from her job at Office Depot because of her pregnancy.  Counts II and IV allege that Defendant's termination of Plaintiff was in retaliation for her complaints of pregnancy discrimination.  Both discrimination and retaliation claims allege violations of Title VII of the Civil Rights Act of 1964 (Title VII) and of the New Jersey Law Against Discrimination (NJ LAD).  Plaintiff further asserts that she is entitled to punitive damages because Defendant engaged in discriminatory practices with malice or with reckless indifference to federally protected rights.  NJ LAD claims are analyzed under the same standard as claims brought under Title VII, therefore the court may confine its analysis to Title VII.  See Marzano v. Computer Science Corp., 91 F.3d 495, 502 (3d Cir. 1996);  Cortes v. Univ. of Med. & Dentistry of N.J.,391 F.Supp.2d 298, 311 (D.N.J.2005) (citing Abrams v. Lightolier, Inc., 50 F.3d 1204, 1212 (3d Cir.1995)).

Title VII discrimination and retaliation claims are analyzed according to the burden-shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under the McDonnell Douglas framework, the employee must first establish a *prima facie* case.  If the plaintiff meets this threshold, a presumption of discrimination arises; and only then does the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for its adverse employment decision.  If the employer is able to do so, the burden shifts back to the employee, who, to defeat a motion for summary judgment, must show that the employer's articulated

10

reason was a pretext for intentional discrimination.  Id. at 802

In response to both the discrimination and the retaliation claims, Defendant argues that Plaintiff is unable to establish a *prima fachie* case, and in the alternative even if Plaintiff is able to successfully present those claims, Defendant has proffered legitimate, nondiscriminatory reasons for its adverse employment decision and Plaintiff cannot demonstrate that those reasons were a pretext for discrimination.  Finally, Defendant argues that punitive damages are inappropriate here because it cannot show that the employer acted with malice or reckless indifference to the protections afforded under Title VII.

### A.  Pregnancy Discrimination

Title VII prohibits employment discrimination based on an individual's sex.  42 U.S.C. § 2000e-2(a).  The Pregnancy Discrimination Act, a 1978 amendment to Title VII, states:

> The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work. . .

42 U.S.C. § 2000e(k).  The provision is breached "whenever an employee's pregnancy is a motivating factor for the employer's adverse employment decision."  In re: Carnegie Ctr. Assoc., 129 F.3d 290, 294 (3d Cir. 1997).  Federal law prohibits the termination of employees due to pregnancy, but it does not completely prohibit the termination of all pregnant employees.  The law requires that employers treat "pregnant employees the same as non-pregnant employees who are similarly situated with respect to their ability

to work." Doe v. C.A.R.S., 527 F.3d at 364.

Disparate treatment discrimination is proven by either using direct evidence of intent to discriminate or using indirect evidence from which a court could infer intent to discriminate. Id. Barnes supports her claim with evidence from which discrimination may be inferred and the court therefore employs the McDonnell Douglas burden-shifting framework described above to analyze her pretextual discrimination claim.

Pursuant to McDonnell Douglas, a plaintiff must first establish by a preponderance of the evidence a *prima facie* claim of discriminatory discharge. In a case alleging pregnancy discrimination, to raise an inference of any unlawful discharge a plaintiff must show that (1) she was pregnant, and, that the employer knew it; (2) that the plaintiff was qualified for her job, meaning she was performing her job well enough to meet her employer's legitimate expectations; (3) that she suffered an adverse employment decision; and (4) that there is a nexus between her pregnancy and the adverse employment action. Doe v. C.A.R.S., 527 F.3d at 365.

Neither party disputes that Barnes met her burden on the first and third elements of the *prima facie* case. However, Defendant argues that Plaintiff failed to demonstrate that she was meeting her employer's legitimate expectations when she was terminated, and disputes whether there is any nexus between her pregnancy and her termination that would permit a fact-finder to infer unlawful termination.

It is Defendant's position that Plaintiff suffered the adverse employment action, not because of her pregnancy, but because she was not performing her job at a level that was meeting Office Depot's legitimate expectations. As a warehouse "picker", Plaintiff was required to manually fill customer orders by gathering items located in her work

12

zone and placing them into boxes that were transported from zone to zone on a conveyor belt. Other duties while employed by Office Depot, included constructing boxes in the inducting area, and "doing one-liners" which involved placing small items into envelopes. These positions required Plaintiff's presence in the assigned work zone in order to ensure that boxes moved along the conveyor belt, attention to the details contained in the order forms, knowledge of the layout and organization of the warehouse, and at least some physical strength and ability.

According to Defendant, Plaintiff repeatedly caused delays on the production line by not working fast enough, by socializing, and by being absent from her work zone. Testimony of supervisors Michael Alfano, Karin Butfuloski, and Donald Jackson all describe that productivity in the warehouse was compromised by Ms. Barnes's performance and failure to remain at her work station. Defendant argues that evidence of the PIPS issued to Plaintiff, comments made by co-workers regarding Plaintiff's slow pace and lack of productivity, and testimony of supervisors, reveal that Plaintiff was not meeting the expectations of the employer. Management required that Ms. Barnes notify a supervisor if she needed to leave her work zone and asked that she return immediately after bathroom and water breaks. Plaintiff allegedly failed to comply and was often missing from her work zone for significant periods of time.

Plaintiff argues on the other hand that Mr. Alfano, who was Plaintiff's direct supervisor at the time of her termination, testified that he was not aware of a specific time that production was interrupted because of Ms. Barnes.[7] Furthermore, Plaintiff

---

[7] Defendant points out that Mr. Alfano also testified that, "the biggest problem I had with Christina was that no matter where I put her to work or flex, her time off the floor, 25 minutes at a time, would impact the entire flow of the whole production system, which caused a lot of red flags with the other

points to the salary increase she earned in March of 2007 as evidence that she was performing her job at a satisfactory level.[8]  Plaintiff highlights that prior to February 19, 2007, the day she informed Defendant that she was pregnant she had not received any written disciplinary notices; however, only a few days after informing Office Depot management that she was pregnant she was written up for the first time.

Plaintiff also argues that in addition to evidence already described, a causal connection between her pregnancy and her termination may be inferred from discriminatory comments made by her supervisors.  Plaintiff testified in her deposition that supervisors commented about how slowly she walked and that they commented on how frequently she went to the bathroom. (Barnes at 201:24-203:25.)  For example, Plaintiff recalls statements made by Karen Butfuloski that "it seemed every time she turned around plaintiff was in the bathroom." (Barnes at 204: 11-12.)  The court is not satisfied that supervisors' observations and comments regarding Plaintiff's slow pace and poor performance constitute discrimination in light of the various accommodations those supervisors made on Plaintiff's behalf.  Most of these comments refer to Plaintiff's work and productivity, not her pregnancy.  However, the court is troubled by the proximity of Plaintiff's pregnancy announcement and commencement of a written disciplinary record.  This evidence raises an inference of unlawful discrimination.

The burden of production next shifts to the employer to articulate some

---

associates." (Alfano at 85:22-86:4.)

[8] Plaintiff received a step pay increase in March of 2007.  However, Donald Jackson told Plaintiff that she was not getting a pay increase at the six month interval because, "[she was] never where [she] supposed to be. [She] always keep[s] leaving to go to the bathroom."  That was the only explanation that Plaintiff received.  (Barnes at 81:11-81:13.)

legitimate, nondiscriminatory reason for the adverse employment action. Doe v. C.A.R.S., 527 F.3d at 370. "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994.) The employer satisfies this relatively light burden of production by introducing evidence that would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. Id. Here, Office Depot asserts that Plaintiff was terminated because she was continuously absent from her workstation without advising a supervisor, frequently socializing with other employees and repeatedly causing delays in production. Furthermore the company argues that during her short tenure of seven months she received repeated counseling and four PIPs. The employer has presented a satisfactory explanation properly supported, thereby eliminating the inference of discrimination created by the plaintiff's *prima facie* case.

The burden of production shifts back to the plaintiff to show that the legitimate reason offered by the defendant are merely a pretext for discrimination. See Jones v. School Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999). In order to show pretext, a plaintiff must submit evidence which convinces the fact finder that the reason proffered by the employer was either a post hoc fabrication or otherwise did not actually motivate the employment action. Fuentes, 32 F.3d at 764. The question is whether the employment decision was caused by bias. Id. The plaintiff need not prove that the illegitimate factor was the sole reason for the decision, but that it was a determinative factor or one that made a difference in the employer's decision. Id. "The non-moving

plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." Id. at 765 (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 527 (3d Cir.1992)).  While this standard places a difficult burden on the plaintiff, "it arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decision-making by the private sector in economic affairs."  Id.

The Third Circuit noted in Doe v. C.A.R.S., the *prima facie* case and pretext inquiries often overlap.  527 F.3d at 370.  Evidence supporting the prima facie case is often helpful in the pretext stage, and nothing about the McDonnell Douglas formula prevents using the same evidence in both stages of review.  Id. (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir.2000)).

In Mickens v Penn Mut. Ins. Co., the court held that termination of an employee for excessive absences and failure to comply with company policy did not constitute pregnancy discrimination.  No. 93-6875, 1994 WL 396396 (E.D.Pa. July 29, 1994.) There, the employee was placed on probation for excessive absences and for misuse of company telephones, and was then terminated for violations of the terms of her probation.  The Mickens court held that the plaintiff failed to establish that the employer's nondiscriminatory reason was merely a pretext for pregnancy discrimination even though the employee was placed on probation only a couple of days after she informed the employer she was pregnant.  Id. at *14.  Noting that the employer's expectations and procedures were consistent with the company's employee handbook,

the court concluded that the employee's allegations of discriminatory animus on the part of any of the people responsible for her termination were not credible despite evidence of statements that were made by persons involved in the decision making process regarding costs associated with maternity leave. Id. at *11. Furthermore, the court stated that there was no evidence presented that the company treated non–pregnant employees better than pregnant employees. Id. at *14.

Similar to the plaintiff in Mickens, Ms. Barnes was repeatedly absent from her work station and violated several of the employer's policies such as the no cell phone policy. Just as that plaintiff was put on probation two days after her pregnancy was announced, Ms. Barnes was also issued her first PIP only a few days after she informed management of her pregnancy.   In both cases there is evidence of supervisors or managers making comments related to the Plaintiffs' pregnancy; however, in both instances comments were not shown to be temporally proximate to the termination or evident of any discriminatory animus.  Finally, the record here is likewise deficient in terms of evidence revealing disparate treatment of the plaintiff.

Disparate treatment, whereby a plaintiff shows that she was treated less favorably than similarly situated employees who are not in plaintiff's protected class is the evidence most often used to establish a nexus or pretext. Iadimarco v. Runyon, 190 F.3d 151, 162 (3d Cir. 1999).  Ms. Barnes accordingly argues that she was disciplined on three occasions for taking extended breaks, but that supervisors did not discipline other employees for taking such breaks even though delays caused by extended breaks was described as a common problem.  (Michieka at 44:15-45:5.) To support this point Plaintiff submits the testimony of Stanley Michieka who agreed that extended breaks

17

was a common problem.  However, Plaintiff provided no other evidence to support the contention that other employees were committing such offenses and were not similarly reprimanded or terminated.   At oral argument Plaintiff conceded that she did not possess any HR records or other evidence supporting a contention of disparate treatment.

The defendant argued that Stanley Michieka's testimony was mischaracterized and that no other employee took breaks with the same frequency or duration as Ms. Barnes.  Furthermore, Defendant further argues that Office Depot regularly terminated warehouse associates from the Westampton, N.J. facility.  During the year prior to and the year following plaintiff's termination, 111 warehouse employees were discharged. (Def. Statement of Undisputed Material Facts ¶ 101.)  Employees were discharged due to unsatisfactory work performance, conduct, position redundancy, attendance, job abandonment and for failure to report to work.  (Id.)  Defendant asserts that this evidence reveals that Office Depot regularly and consistently enforces its employment policies and that the plaintiff was not singled out because she was pregnant.  The court finds that the record is deficient in terms of Plaintiff's disparate treatment argument.

While the court recognizes the proximity between the time that supervisors began filing written disciplinary notices against Plaintiff and Plaintiff's pregnancy announcement, testimony by supervisors indicates that Plaintiff was counseled regarding poor performance prior to her pregnancy.  (Id. at ¶ 23.)  Evidence shows that Plaintiff was repeatedly counseled and disciplined for being absent from her work zone, for not working efficiently, and for socializing with other employees when she was on duty.  Ms. Barnes's behavior garnered complaints not only from supervisors, but also

from co-workers.   It is also significant that soon after Plaintiff told her supervisors that she was pregnant she received a salary increase, and when Plaintiff presented management with a note from her doctor with precautionary limitations regarding heavy lifting, plaintiff was assigned to another position with job functions that she could perform.   Moreover, the plaintiff was permitted to take breaks throughout the day provided she inform a supervisor that she was leaving her post so that the manager could ensure her absence caused no delay.   Evidence suggests that Office Depot made accommodations but that Ms. Barnes abused those accommodations by not returning promptly after her break.

Finally, the court notes that many of the incidents for which Plaintiff was disciplined were unrelated to her pregnancy and that comments made to her all related to her ability to perform her job functions.   On February 27, 2007, Plaintiff was put on PIP by her manager Jackson, because she "continued to wander around the building" and had left her work zone which effected productivity.   Plaintiff was criticized for socializing too much and not concentrating on her job.   Plaintiff committed fourteen performance errors during the week of April 1, 2007, which exceeded the permissible number. And Plaintiff's final PIP was issued when she did not return to her work area after a break so that she could return a cellular telephone to a co-worker.

Defendant submits a legitimate nondiscriminatory reason for terminating plaintiff which is supported by the record.   Plaintiff has not generated or exposed evidence sufficient to establish that the Defendant's reason was merely pretext for discrimination.   As a result, there is no genuine issue of material fact as to claims of discrimination and summary judgment will be granted as to Counts I and III.

**B.  Retaliation**

The second and fourth Counts of the Complaint allege that Office Depot terminated Plaintiff in retaliation for complaints that she was being discriminated against on the basis of pregnancy in violation of Title VII and the NJ LAD.  Under Title VII, it is unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).  Retaliation claims raised under Title VII and the NJ LAD are analyzed under the same McDonnell Douglas burden shifting framework utilized in the discrimination context.   Here, Ms. Barnes claims that Office Depot supervisors retaliated against her and terminated her on the basis of internal complaints to supervisors and to Human Resources.

In order to successfully assert a retaliation claim, the plaintiff must demonstrate that she: (1) engaged in a protected activity; (2) suffered an adverse employment action; and (3) that there is a causal connection between her participation in the protected activity and the adverse employment action.  Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006).  Here Defendant only disputes whether Plaintiff can produce evidence of a causal connection between her internal complaints alleging pregnancy discrimination and her termination.  A causal connection may be established by circumstantial evidence, such as temporal proximity, a pattern of antagonism, and pretext.  Kachmar v. SunGard Dada Sys., 109 F.3d 173, 177 (3d Cir. 1997).

In Kachmar, the Third Circuit explained that proof of a causal connection

20

between a protected activity and an adverse employment action involves a highly specific inquiry into the motives of an employer and may be established in a number of ways.  109 F.3d at 177.  Causation may depend on the temporal proximity between the employee's protected activity and the adverse employment action.  Id.  Temporal proximity can serve as circumstantial evidence "sufficient to raise the inference that [the plaintiff's] protected activity was the likely reason for the adverse action."  Id. (quoting Zanders v. Nat'l R.R. Passenger Corp., 898 F.2d 1127, 1135 (6th Cir.1990)).  Absent temporal proximity, "circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference."  Kachmar, 109 F.3d at 177.  Temporal proximity and a pattern of antagonism, however, "are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference."  Id.

Defendant first argues that Plaintiff cannot demonstrate a causal connection because the supervisor who made the ultimate decision to discharge the plaintiff, had no knowledge of her internal complaints to Human Resources or complaints lodged with other supervisors.  Defendant asserts that if the decision-maker had no knowledge of a plaintiff's engagement in a protected activity, there is no causal link between the adverse employment action and the engagement in the protected activity.  See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271-73 (2001); Dooley v. Roche Lab, Inc. 275 Fed. Appx. 162, 165 (3d Cir. 2008) ("Plaintiff fails to make a prima facie case because she does not point to any evidence that the decision makers . . . were aware of her internal complaints"); Bailey v. Commerce Nat. Ins. Serv.s, Inc., 267 Fed. Appx. 167, 170 (3d Cir. 2008); Jones v. Sch. Dist. of Phila., 198 F.3d 403, 415 (3d Cir.1999) (Third Circuit

affirmed a grant of summary judgment where there was no evidence that the principals who made the decision to fire the plaintiff were aware of the protected action).

The court finds that Mr. Alfano was aware of Plaintiff's complaints and allegations of discriminatory treatment.  Without considering Plaintiff's affidavit, the court finds that record reveals knowledge on the part of Mr. Alfano.  In his deposition, Mr. Alfano testified that he informed Ms. Parker, the Human Resources representative with whom he met regarding termination of Ms. Barnes, that Ms. Barnes complained that the discipline she received was related to her pregnancy and that he knew she was "constantly up in HR's office".  (Alfano at 53:2-53:8.)  Furthermore, there was written record of Mr. Jackson's discussion with Ms. Barnes where he reprimanded her for going to HR during her shift in Plaintiff's personnel file.  The court is satisfied, based on the comments made to Ms. Parker that Mr. Alfano recalled during deposition, that Mr. Alfano was aware of Plaintiff's allegations and complaints.

The court having decided that threshold matter, turns to evidence submitted regarding temporal proximity.  An inference of retaliation exists when an employee is terminated shortly after engaging in protected activity.  Alone, temporal proximity may not be enough to defeat summary judgment when the temporal relationship is not unusually suggestive or is too attenuated to create a genuine issue of fact.  See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000) (citing Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir.1997)).  However, "[w]here the temporal proximity between the protected activity and the adverse action is "unusually suggestive," it is sufficient standing alone to create an inference of causality and defeat summary judgment."  LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233

22

(3d Cir. 2007).  Courts have found adverse action by employers to be "unusually suggestive" where, for example, a plaintiff was discharged two days after his employer received his EEOC claim.  Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir.1989).

Like the plaintiff in Jalil, Ms. Barnes alleges in her affidavit that she complained of unfair treatment and discrimination to Mr. Alfano and Mr. Jackson just a few days before she was terminated.  Ms. Barnes stated in her Affidavit that on July 11, 2007, she pulled Mr. Alfano and Mr. Jackson aside and told them that she was tired of being singled out and treated unfairly because of her pregnancy.  (Pl. Ex. H at ¶ 9.)  Plaintiff's Affidavit states:

> 7.  I complained that I was being treated unfairly because of my pregnancy directly to human resources, as well as to Donald Jackson, Michelle Bullock, and Michael Alfano.

> 9.  On July 11, 2007, I pulled Donald Jackson and Michael Alfano aside and told both of them that I was tired of being singled out because I was pregnant. I told them that I believed I was being disciplined and treated unfairly because I was pregnant. Alfano did not respond, but Jackson just shrugged my comment off and told me that Office Depot does not discriminate, and I should get back to work.

(Pl. Ex. H ¶¶ 7, 9).  Plaintiff argues that the timing of the adverse action is unduly suggestive of retaliation, and whether Defendant was unlawfully motivated to terminate Ms. Barnes calls for factual and credibility determinations which are the province of the fact finder.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).  The court agrees.

Defendant urges the court to disregard Plaintiff's affidavit because it contradicts her prior sworn Answers to Interrogatories and her deposition testimony.  A plaintiff "may not create an issue of material fact to defeat summary judgment by filing an

affidavit disputing . . . her sworn testimony without demonstrating a plausible explanation for the conflict." Jiminez v. All A. Rathskeller, Inc., 503 F.3d 247, 251 (3d Cir. 2007). This principle of summary judgment practice is often referred to as the "sham affidavit doctrine." Id. Disregarding "sham affidavits" serves the important purpose of preventing the serious impairment of the "objectives of summary judgment." Martin v. Merrell Dow Pharm., Inc., 851 F.2d 703, 706 (3d Cir.1988).

A sham affidavit is a contradictory affidavit that indicates that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment. Jiminez, 503 F.3d 253. Therefore, if it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate. Id. at 254.

On the other hand, courts will generally not declare an affidavit a sham if it helps to correct a mistake or resolve "ambiguous testimony." E.g., St. Paul Mercury Ins. Co. v. Capital Sprinkler Inspection, Inc., 573 F.Supp.2d 152, 160-161 (D.D.C.2008); Knauf Realty, LLC v. Prudential Real Estate Affiliates, Inc., 486 F. Supp 2d 855, 857 (noting that the "sham affidavit rule" does not apply to "elaboration on ambiguous testimony that the other party failed to clarify during a deposition"). In determining whether an affidavit constitutes a sham, courts will consider "whether corroborating evidence" bolsters the otherwise questionable affidavit. Baer v. Chase, 392 F.3d 609, 625 (3d Cir.2004). "Such corroborating evidence may establish that the affiant was 'understandably' mistaken, confused, or not in possession of all the facts during the previous deposition." Jiminez, 503 F.3d at 254.

The court having carefully reviewed the record does not consider the sworn statements contained in Plaintiff's Affidavit contradictory testimony within the meaning of the sham affidavit doctrine.  During her deposition Ms. Barnes described complaints she made to Human Resources.  After describing those complaints, she was asked whether she complained to anyone else.  She responded that she had complained to Stanley Michieka about comments being made regarding the frequency of her bathroom and water breaks.  (Barnes at 205:18- 205:24.)  Counsel, then followed up with a question, "Did you complain to Michelle" (referring to Michelle Bullock a supervisor replaced by Mr. Alfano).  There does not appear to be any direct questing as to whether Ms. Barnes made comments to Mr. Alfano or Mr. Jackson or any of the other supervisors.  In addition, as described previously, Mr. Alfano was aware that Ms. Barnes believed she was the target of discrimination.  The statements that he made to Ms. Parker further support assertions that Ms. Barnes complained to him regarding the mistreatment she perceived.

Plaintiff's file also contains record of a conversation that took on April 13, 2007 when Donald Jackson reprimanded Ms. Barnes for leaving her work zone without authorization after Plaintiff went to Human Resources to complain about mistreatment. Jackson told her that if she needed to communicate with HR during working hours should get permission from a supervisor to go speak with them or could use the "800" number.  (Ex. K.)  There is also evidence that despite Plaintiff's complaints of unfair treatment management did not pursue the matter.  Ms. Barnes described her interactions with HR as well as the complaints she made directly to managers:

Q.  Did you ever complain to Human Resources about any of the statements that

25

[Donald Jackson] or Karen made to you?
A.  Yes.
Q.  Who did you talk to in human resources?
A.  It was either Carol or Terry.
. . .
Q.  And when you talked to Carol, how many times did you talk to Carol?
A.   Numerous times.  I told her, you know, that they continue saying this.  They keep making comments, and the only thing she says is, talk to your manager, tell another manager, see Stanley, it's up to them.
. . .
Q.  Did you ever call the hotline to complain about statements made by DJ or Karen?
A.  No.
Q.  Did you complain to anyone else?
A.  I've complained to Stanley . . . I would just basically say Stanley, you know, when can I get a chance to talk to about, you know, comments and stuff that's being made.  He says I'll, you know, I'll get ahold of you when I can, when I get a chance.
Q.  And did he ever get ahold of you?
A.  No.
Q.  So did you ever tell him what the comments were?
A.  I told him a couple times standing on the line.
Q.  And you told him about that they were complaining that you were going to the bathroom too much and going for water too much?
A.  Yes.
Q.  Anything else?
A.  The comments that no one's going to do my job for me.

(Barnes at 205:18- 205:24.)

Viewing the facts in the light most favorable to the non-moving party, as is required on motion for summary judgment, the court is satisfied that evidence supports a finding of a causal connection between Plaintiff's participation in a protected activity and the adverse employment action.  As stated, the employer had a legitimate non-retaliatory reason for discharging Ms. Barnes; however, the court further finds that for the same reasons described in regards to the causal connection, the plaintiff has shown that the legitimate nondiscriminatory reason was pretextual.  Therefore, Summary Judgment is denied as to Counts II and IV.

### C.  Punitive Damages: Under Title VII and the NJ LAD

A Title VII plaintiff may recover punitive damages for intentional discrimination where "the complaining party demonstrates that the respondent engaged in . . . discriminatory practices with malice or with reckless indifference to . . . federally protected rights."  42 U.S.C. § 1981a(b)(1); Le v. Univ. of Pa., 321 F.3d 403, 409 (3d Cir.2003).  The terms "malice" and "reckless" ultimately focus on the actor's state of mind.  In Kolstad v. American Dental Ass'n, 527 U.S. 526, (1999), the Supreme Court held that punitive damages liability can be imposed upon an employer for the discriminatory behavior of its agent when "an employee serving in a managerial capacity committed the wrong while acting in the scope of employment." Id. at 543.  However, in Kolstad the Supreme Court held that in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents when those decisions are contrary to the employer's good-faith efforts to comply with Title VII.  Id. at 545.  The good faith inquiry focuses on whether the employer took steps to detect and deter Title VII violations, to enforce discrimination policies, and to prevent discrimination in the work place.

Under NJ LAD, punitive damages are warranted where the defendant's conduct is "especially egregious."  Rendine v. Pantzer, 141 N.J. 292, 314, 661 A.2d 1202 (1995).  See also Weiss v. Parker Hannifan Corp., 747 F.Supp. 1118, 1135 (D.N.J. 1990) ("Like any other case where punitive damages are available, punitive damages should only be awarded under the NJ LAD in exceptional cases.");  Catalane v. Gilian Instrument Corp., 271 N.J. Super. 476, 500-01, 638 A.2d 1341 (N.J. Super. App. Div., 1994) ("We . . .  agree that punitive damages are only to be awarded in exceptional cases even where the LAD

27

has been violated." (citations omitted)).  It is firmly settled that in LAD cases, punitive damages can only be assessed against an employer if there was "actual participation by upper management or willful indifference."  Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 625, 626 A.2d 445 (1993); Maczik v. Gilford Park Yacht Club, 271 N.J.Super. 439, 446, 638 A.2d 1322 (N.J. Super. App. Div., 1994).

Defendants contend that Office Depot had written anti-discrimination policies and procedures in place which demonstrate a good faith effort to comply with Title VII. The company also maintains a Problem Resolution Process, which provides employees with a method of reporting problems that they have regarding their employment and specifically provides a mechanism to bypass their supervisors should the situation require it.  Each employee receives a copy of Office Depot's People Manual and an Employee Handbook, which contain Office Depot's anti-discrimination policy and policies for enforcing and reporting violations.  Moreover, Plaintiff received training on harassment during her orientation.  Defendant further argues that management made numerous accommodations for Plaintiff when supervisors learned of her pregnancy including moving her into jobs that required little or no heavy lifting or climbing, excusing her to go to the bathroom and water cooler as often as she needed, and only asking for notification when she needed to leave her work zone to take a break.

On the other hand, Plaintiff alleges that a genuine issue of material fact exists with regard to the reasonableness of the Defendant's efforts to implement those policies and procedures.  There is no dispute that Office Depot instituted an anti-discrimination policy and that Plaintiff received a copy of that policy as well as training about harassment in the workplace.  However, the record indicates unwillingness to respond

to complaints submitted by the plaintiff by high level Office Depot employees.   (Barnes at 205:18- 205:24.)

The court finds that the evidence in support of Plaintiff's claim and all favorable legitimate inferences to be deduced therefrom is sufficient to submit to a jury to determine whether the offending conduct was especially egregious to warrant the imposition of punitive damages against Office Depot.  Whether Office Depot made a good faith effort to comply with Title VII and to respond to complaints made by Ms. Barnes is a question of fact best left to a jury.

### III. CONCLUSION

As the Court has already observed, the summary judgment record raises genuine issues of material fact with regard to Office Depot's reasons for terminating the Plaintiff. Whether Plaintiff was terminated in retaliation for complaints of pregnancy discrimination is a question for the jury.  In addition, because the Court cannot conclude, as a matter of law, that the Defendant was in compliance with Title VII and the NJ LAD, the Court will deny that part of Defendant's motion which seeks summary judgment with respect to Plaintiff's demand for punitive damages under the Acts.

Defendant's Motion for Summary Judgment [17] is DENIED as to Counts II and IV and GRANTED as to Counts I and III.  Furthermore, the Motion is DENIED as to dismissal of Plaintiff's claim for punitive damages.   An appropriate Order will follow. Dated: November 24, 2009.

/s/ Joseph H. Rodriguez

HON. JOSEPH H. RODRIGUEZ,
United States District Judge